1  BRIAN J. STRETCH (CABN 163973)
   Acting United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  BRIGID S. MARTIN (CABN 231705)
   Assistant United States Attorney
5        1301 Clay Street, Suite 340S
         Oakland, California 94612
6        Telephone: (510) 637-3680
         FAX: (510) 637-3724
7        Brigid.Martin@usdoj.gov

8  Attorneys for the United States of America

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                         OAKLAND DIVISION
12

13
   UNITED STATES OF AMERICA,            )  NO. CR 15-00372 JD
14                                       )
           Plaintiff,                    )  UNITED STATES' OPPOSITION TO
15                                       )  DEFENDANT'S MOTION TO DISMISS
       v.                                )  COUNTS ONE AND TWO OF THE
16                                       )  INDICTMENT
   ALEJANDRO JIMENEZ,                    )
17                                       )  Hearing:  January 15, 2016
           Defendant.                    )  Time: 11:00 a.m.
18                                       )  Court:  Hon. James Donato, San Francisco
   _____)  Courthouse
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   FACTS ........................................................................................................1

III.  STATUTORY SCHEME AT ISSUE ..........................................................4

IV.   ARGUMENT ...............................................................................................6

    A.    THE CONSTITUTION REQUIRES ONLY THST STATUTES PROVIDE REASONABLE NOTICE ...........................................6

        1.    THE STATUTORY SCHEME PROVIDES REASONABLE NOTICE THAT THE RECEIVER IS ITSELF A FIREARM AND MACHINEGUN ...........................................................6

        2.    THE AR-15 UPPER ASSEMBLY MAY LAWFULLY BE REGULATED AS A "RECEIVER" AS DEFINED BY THE IMPLEMENTING REGULATIONS BECAUSE THIS COMPORTS WITH STATUTORY LANGUAGE AND CONGRESSIONAL INTENT .........................................................9

        3.    NO PROVISION OF THE NATIONAL FIREARMS ACT (NFA) HAS BEEN FOUND UNCONSTITUTIONALLY VAGUE.............................14

        4.    DEFENDANT'S POSITION WOULD RENDER MORE PERNICIOUS FIREARMS LEGAL UNDER THE VARIOUS FIREARMS STATUTES ...........................................................15

    B.    DEFENDANT'S CLAIM MUST FAIL BECAUSE THE STATUTE CLEARLY PROSCRIBES DEFENDANT'S CONDUCT ...............15

V.    CONCLUSION............................................................................................18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ........................... 6

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ........................ 13

*Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996) ............................ 14

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ..................................... 6

*Parker v. Levy*, 417 U.S. 733 (1974) ............................................ 7

*Staples v. United States*, 511 U.S. 600 (1994) .................................. 5

*United States  v. Whalen*, 337 F.Supp. 1012 (S.D.N.Y. 1992) .................... 14

*United States v. 1,100 Machine Gun Receivers*, 73 F. Supp. 2d 1289 (D. Utah 1999) ...................................................................... 16

*United States v. Bradley,* 892 F.3d 634 (7th Cir. 1990) ......................... 14

*United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) ...................... 8, 16

*United States v. Catanzaro*, 368 F. Supp. 450 (D. Conn. 1973) .................. 14

*United States v. Hunter*, 843 F. Supp. 235 (E.D. Mich 1994) .................... 15

*United States v. Kurt*, 988 F.2d 73 (9th Cir. 1993) ........................ 14, 16

*United States v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial Number 85279*, 378 F.3d 533 (6th Cir. 2004) .................... 17

*United States v. Schales*, 546 F.3d 965 (9th Cir. 2008) ......................... 6

*United States v. Williams*, 364 F.3d 556 (4th Cir. 2004) ................... 7, 8, 16

*York v. Secretary of Treasury*, 774 F.2d 417 (10th Cir. 1985) ................. 17

## FEDERAL STATUTES

Gun Control Act, 18 U.S.C. § 921 et seq. .................................. 9, passim

18 U.S.C. § 921 ................................................................. 9

18 U.S.C. § 921(a)(23) ...................................................... 4, 15

18 U.S.C. § 921(a)(3) ....................................................... 9, 15

18 U.S.C. § 922(g)(1) .......................................................... 15

18 U.S.C. § 922(l) ............................................................. 10

18 U.S.C. § 922(o) ........................................................................................... 1,4,15

18 U.S.C. § 923(g) ................................................................................................. 9

18 U.S.C. § 923(i) .................................................................................................. 9

26 U.S.C. § 5845 ................................................................................................... 15

26 U.S.C. § 5845(b) ............................................................................................... 4

26 U.S.C. § 5861(d) ........................................................................................ 1,4, 15

### STATE STATUTES

California Penal Code, Section 25400(a)(2) ............................................................ 3

### FEDERAL REGULATIONS

27 C.F.R. § 478.11 .................................................................................................. 4

27 C.F.R. § 478.121 ............................................................................................... 9

27 C.F.R. § 478.92 ................................................................................................ 10

27 C.F.R. § 478.39 ................................................................................................ 10

### OTHER AUTHORITIES

P.L. 90–351, 90th Cong., 2d Sess. (1968) 82 Stat. 197 ......................................... 9

S.Rep. No. 90–1097 (1968) ............................................................................... 9, 10

Letter to Assistant Regional Commissioner Re:M-16 Receivers Forged By Kaiser Aluminum and Chemical Company, Erie, Pa., and Subsequently Machined by Firearms Manufacturers such as Colt, H&R Arms Company, and General Motors Corporation (Feb. 23, 1971) ................................................ 11

Letter to Mr. Michael D. Kokin of Sherwood Distributors Inc. (Jan. 19, 1972) ....................................... 11

Letter CC-23932 from Assistant Chief Counsel (Litigation) to Acting Assistant Director (CE) Re: FN FAL Machinegun Receivers (Jan. 24, 1977) ......................................................................... 12

## I.    INTRODUCTION

The United States respectfully submits this opposition to Defendant's Motion to Dismiss Counts One and Two of the Indictment (Doc. 12).  Defendant argues that the criminal statutes he charged with violating, 18 U.S.C. § 922(o), possession of a machinegun, and 26 U.S.C. § 5861(d), receipt or possession of an unregistered firearm, "are unconstitutionally vague as applied to the specific facts of [the defendant's] case."  Def. Br. at 3.  More specifically, defendant argues that the definition of "receiver" as applied to AR-15/M-16-style firearms (whether semi-automatic or machinegun) is unconstitutionally vague.  The government disagrees.  The "receiver" of an AR-15/M-16-style firearm is and has always been the lower portion, the same portion that the defendant illegally purchased and possessed in this case.  The statute and statutory scheme puts individuals of ordinary intelligence on notice that possessing such a receiver is illegal and a violation of federal law.  Furthermore, this defendant knew that possession of such a receiver was illegal under federal law.  The statutory scheme does not permit arbitrary enforcement, and has not resulted in arbitrary enforcement.  Finally, the defendant does not set forth any facts reflecting that he was a member of any class that he argues might theoretically be unconstitutionally affected by the statute.  Therefore, the government respectfully requests that the Court deny the defendant's Motion to Dismiss Counts One and Two of the Indictment.

## II.    FACTS

The defendant in this case has been indicted on violations of federal law relating to his purchase and possession of a machinegun receiver from an undercover agent in July 2015.

At least as early as January 29, 2015, the defendant in this case was using his cellular smartphone to search for information pertaining to fully automatic AR-15-style firearms and, even more specifically, drilling (or milling) AR-15-style or M-16-style receivers to achieve fully automatic firing. The search terms from the smartphone the defendant was arrested with on July 1, 2015, show that keyword values including the following were used between January 29 and June 25, 2015, to access topical YouTube videos and other websites:  80% lower, 80% lower drill bit, ar 15 conversion 22, ar 15 takedown pin removal, drilling m16 lower, full auto ar-15, milling ar 15 lower, milling m 16 lower, and shortest ar15 full auto (sic).  Significantly, "drilling m 16 lower," "full auto ar-15," "milling ar 15

lower," "milling m 16 lower," were terms inputted by the user on January 29, 2015, months before the sale of the machinegun receiver to the defendant at issue in this case. Gov. Ex. 1 (highlights added).

Text messages found by agents on the same smartphone show that in June 2015, the defendant was using the smartphone to communicate with contacts "Edgar" and "Omar," about purchasing firearms. Gov. Ex. 2. With regard to "Edgar," the two texted on June 24, 2015, about the cost of an AR-15 rifle. *Id.* "Edgar" asked the defendant how much an AR-15 would "go for." *Id.* The defendant replied, "1000." *Id.* "Edgar" then said he knew someone who was selling an AR-15 for $850. *Id.* The defendant texts, "Oh fosho see if you could get 1." *Id.* The defendant also received a text from "Omar" asking the defendant if he knew anyone who could obtain a [Springfield] 1911 .45 caliber firearm. *Id.*

On or about June 23, 2015, the defendant sent a text message in response to an ad on the internet website www.armslist.com advertising for a price of $500.00, "FOR SALE: 80%." Gov. Ex. 3 (AJ-US-00043). More specifically, the ad described the item as a "self milled AR-15 .223/5.56 lower…already has the extra sear pin hole drilled and the deeper fire control cavity for 'extra parts.' *Id.* If you know what that means, then you know why I'm asking so much…." *Id.* The ad shows that the ad was placed on June 22, 2015. *Id.*

Unbeknownst to the defendant, the ad was placed by law enforcement and the defendant subsequently began communicating with an undercover agent (UC) working for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) about purchase of the AR-15 80% lower receiver with the extra sear hole drilled. Gov. Ex. 3 (AJ-US-00046, *et seq*). The defendant asked the UC to send a picture of the AR-15 receiver. *Id*. After the defendant received the picture, he asked the UC if "any bill of sale" is needed. *Id.* The UC responded, "Bill of sale? This is a full auto bro." *Id.* The defendant replied, "I know…." *Id.* The UC had also advertised a Glock 19 pistol for sale on the armslist.com website. Gov. Ex. 3 (AJ-US-00044). The defendant told the UC he was also interested in the Glock advertised and asked to see a picture. *See* Gov. Ex. 3 (AJ-US-00046, *et seq*). The UC responded but sent a photo of a Glock 22, a different model than advertised. *Id.* The defendant immediately noticed that this was a different model than advertised, identifying the firearm pictured as a Glock 22. *Id.* The UC then replied that it was his mistake, and sent another picture, this time of a Glock 19 and extended

magazine.  *Id.*  The defendant agreed to meet with the UC to buy both the AR-15 lower receiver and the Glock.  *Id.*

The defendant would not legally have been able to complete necessary paperwork to legally purchase a firearm because in or about January 2014, the defendant was convicted of California Penal Code section 25400(a)(2), carrying a concealed weapon, a felony crime punishable by a term of imprisonment exceeding one year.  *See* Gov. Ex. 3 (AJ-US-00040 – 41).  In July 2015, the defendant was still on probation in Solano County for this conviction.  *Id.*

The defendant and the UC agreed to meet in the parking lot of the Sun Valley Mall in Concord, California.  Gov. Ex. 3.  At approximately 3:00 p.m. on July 1, 2015, the defendant and the UC arrived at the parking lot in their separate vehicles.  *Id.*  The UC recorded the meeting.  *Id.*  The UC showed the defendant the AR-15 lower receiver and the Glock 19 pistol in the trunk of the UC's car.  *Id.*  Ignoring the Glock firearm, the defendant picked up the AR-15 lower receiver and engaged the UC in the following conversation, excerpted here:

| | | |
|---|---|---|
| Defendant: | It's legal right now? | |
| UC: | What do you mean 'it's legal right now'? | |
| Defendant: | Yeah, like I could do it.  Like I could take it to the range right now and test it out. | |
| UC: | That right there's a fucking machinegun.  You take that to the range you're gonna draw all kinds of attention. | |
| Defendant: | Even if I close it, like if I just have the normal stuff on it? | |
| UC: | That right there is a machinegun, yeah.  Even if you, even if you only have the semi-auto parts on it. | |
| Defendant: | Yeah. | |
| UC: | It's still a machinegun. | |
| Defendant: | So how much you say you wanted for it? | |
| UC: | $500.00. | |

The UC agreed to take $450.00.  *Id.*  The defendant gave the UC $450.00 and took the AR-15 lower receiver.  *Id.*  When the defendant began to walk away with the receiver, he was arrested.  *Id.*

Agents found a smartphone on the defendant's person.  *Id.*  Text messages on the phone recovered from the defendant's person when he was arrested on July 1, 2015, confirm that this was the same phone used to communicate with the UC about the sale of the firearms.  *Id.*

On July 16, 2015, a federal Grand Jury returned an Indictment charging the defendant with two violations of federal law, possession of a machinegun, in violation of 18 U.S.C. § 922(o) (Count One); and receipt or possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d) (Count Two) (Doc 6).

The defendant subsequently filed a Motion to Dismiss both counts contending that "the statutes in the indictment are unconstitutionally vague as applied to the specific facts of [the defendant's] case." Def. Br. at 3.

## III.    STATUTORY SCHEME AT ISSUE

Title 18 U.S.C. § 922(o) prohibits possession of a machinegun.  Title 26 U.S.C. § 5861(d) prohibits possession of certain types of unregistered firearms, including unregistered machineguns.  The Title 26 defines "machinegun," in relevant part, as "any weapon which shoots…automatically more than one shot, without manual reloading, by a single function of a trigger" but adds that "the term shall also include the frame or receiver of any such weapon…."  26 U.S.C. § 5845(b).   Title 18 adopts the definition set forth by Title 26. 18 U.S.C. § 921(a)(23).  Congress did not define the term "receiver" in the GCA, rather, the term "firearm frame or receiver" is defined in the Code of Federal Regulations as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.

The ATF Firearms Technology Criminal Branch examiners and firearms experts concluded  that the receiver possessed and purchased by the defendant is a machinegun under Title 18 and Title 26. Def. Ex. A (AJ-US-0007- 12); Curtis Decl., ¶ 10.

//

The basic premise of the defendant's argument is that because there is an upper assembly and a lower portion for AR-15/M-16 designed rifles,[1] it is vague as to which portion is the "receiver" of the firearm or machinegun, as proscribed by law. The "receiver" of an AR-15/M-16 designed firearm has always been the lower receiver, however, and the statute adequately notifies people of ordinary intelligence that the lower receiver is the receiver and illegal for purposes of the statutory scheme. The regulatory definition of "firearm frame and receiver" does not preclude the ATF from classifying the lower portion of the M-16/AR-15 as the "receiver."

The defendant argues that the regulatory definition of "firearm frame or receiver" requires that for any firearm part to qualify as a receiver, it must always provide "housing for the hammer, bolt or breechlock, and firing mechanism," as receiver is defined in 27 C.F.R. § 478.11. The M-16/AR-15 completed rifle, however, is comprised of two distinct parts — an upper assembly containing the bolt; and a lower portion containing the hammer and housing mechanism that is classified as the "receiver." Because the lower portion of the AR-15/M-16 provides housing for only the hammer and firing mechanism, the defendant concludes that the lower portion may not be properly classified as the "receiver." Def. Br. at 10-12. Defendant claims that this shows that the ATF's application of the regulatory definition has been arbitrary and therefore allows the government to merely pick and choose who will be prosecuted. To the contrary, the ATF has clearly stated that the lower receiver of an AR-15/M-16 is the receiver, and has consistently enforced the law according to that definition.

---

[1] The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire. Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon. No doubt to inhibit such conversions, the AR-15 is manufactured with a metal stop on its receiver that will prevent an M-16 selector switch, if installed, from rotating to the fully automatic position. *Staples v. United States*, 511 U.S. 600, 603 (1994) (holding that knowledge of the characteristics of the weapon that qualify it as a machinegun (e.g., automatic firing) or other Title 26 firearm is element of § 5861(d)).

# IV.    ARGUMENT

The statutes that the defendant has been charged with violating are clear that the receiver of a machinegun is itself a machinegun.  The ATF as well as firearm manufacturers have been consistent in their classification and treatment of the lower receiver as the illegal receiver under AR-15/M-16 style firearms (machineguns as well as semiautomatic).  Furthermore, this argument fails as-applied to the defendant because the defendant is not in any class for which he argues the statute might be vague.

## A.    THE CONSTITUTION REQUIRES ONLY THAT STATUTES PROVIDE REASONABLE NOTICE

A statute is unconstitutionally vague as applied only if the defendant could not have known that the conduct underlying his conviction was covered by the statute.  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  A challenge to a statute's vagueness "rests on the lack of notice, and hence may be overcome in any specific case *where reasonable persons would know that their conduct is at risk*."  *Id.* (emphasis added).  "The Constitution does not require impossible standards; all that is required is that the language [of the statute] conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  *United States v. Schales*, 546 F.3d 965, 972 (9th Cir. 2008) (internal cites omitted).  A criminal statute must provide notice of the prohibited conduct to "a reasonable degree of certainty," but "the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."  *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952).

## 1.    THE STATUTORY SCHEME PROVIDES REASONABLE NOTICE THAT THE RECEIVER IS ITSELF A FIREARM AND MACHINEGUN

Rather than "a patchwork of definitions" that "allows the government to choose who will fall within its contours," (Def. Br. at 13), the definition of machinegun is a carefully crafted definition to include all possible forms of machineguns – a fully functioning and ready to fire machinegun, a combination of parts that could be used to build a machinegun or convert another firearm to a machinegun, as well as the frame or receiver.

Possession of merely this singular part, the receiver, of a machinegun constitutes possession of a machinegun. The statutory scheme fairly places the ordinary person on notice that possessing the receiver of a machinegun is illegal:

> Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that the contemplated conduct is illegal. *See id*. Williams contends that section 5845(b) is impermissibly vague as applied to him because the definition of machinegun does not provide notice as to "possession of what weapon" will violate the statute. In other words, the crux of Williams's argument is that the language in section 5845 violates due process by not specifying the proscribed firearms more clearly. We disagree.
>
> The statutory definition of "machinegun" provides a person of ordinary intelligence clear notice that it is unlawful to transfer a machinegun frame or receiver. As we have already noted, the language of the statute plainly specifies three distinct and individually sufficient categories of machineguns. The first of the three listed categories clearly states that a "frame or receiver" is a proscribed machinegun. Examining the facts of this case, we note that it is undisputed that the firearm Williams possessed and later transferred was such a receiver. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733 (1974). Accordingly, we hold that the statute was not unconstitutionally vague as applied to Williams's behavior.

*United States v. Williams*, 364 F.3d 556, 560 (4th Cir. 2004).

In *Williams*, the defendant sold a Mak 90 rifle modified to automatically fire to an ATF UC. *Id*. at 557. At the time the firearm was transferred, however, the pin preventing automatic firing was still in the firearm receiver. *Id*. The defendant counseled the UC to remove the pin from the receiver to allow automatic firing. *Id*. The defendant was convicted of possessing a machinegun because the receiver was modified to allow automatic firing and was therefore a machinegun under the definition of Title 26, even though the completed firearm at the time of the transfer contained a removable pin that, when in place, allowed the firearm to fire semiautomatically. *Id*. at 559. The Court denied the defendant's claim that the statute was vague, and found that regardless, the defendant could not successfully challenge the statute for vagueness as the statute clearly applied to the defendant's conduct. *Id*. at 560.

Here, defendant Jimenez was similarly on notice that the receiver of a machinegun was illegal. And with full knowledge of the receiver's critical modifications that allow automatic fire, and evidence

showing that this is precisely why he wanted to buy the receiver, he cannot successfully challenge the statute where it clearly applies to his conduct.

Analogously, in *United States v. Carter*, the Court affirmed defendant's conviction for possession of a machinegun under § 5861(d), over defendant's claim that the statutory definition of machinegun was vague. 465 F.3d 658 (6th Cir. 2006). In *Carter*, the defendant was indicted on possession of a machinegun in violation of 26 U.S.C. § 5861(d) under two theories: that he possessed (1) a machinegun receiver, and (2) a combination of parts designed to convert a firearm to a machinegun. *Id.* at 663. The defendant claimed that construing the phrase "frame or receiver of any such weapon" in § 5845(b) as a machinegun would render the statute unconstitutionally vague. *Id.* He also argued that because he did not possess a trigger mechanism and was not charged with possessing a trigger mechanism, the parts in his possession did not constitute a machinegun. *Id.*

The Court first confirmed that *Williams* and consistent prevailing case law have held and affirmed that the "receiver" is a machinegun under § 5845(b). *Id.* The Court then stated that where the indictment set out clearly and concisely that the defendant was charged with possessing the frame or receiver of a machinegun and parts designed and intended for use in converting a weapon into a machinegun, that the absence of an allegation that the defendant possessed a mechanical trigger is essentially irrelevant where testimony established that the weapon could actually be fired manually. *Id.* 664. That is to say, although this firearm did not have a mechanical trigger that would meet the definition set forth in § 5845, that the firearm was made "to fire automatically" with a "single function of the trigger," function of the trigger could be interpreted logically (and not arbitrarily) to include any method of firing, despite the specific language in the statute. *See id.* at 664-65. The Court found no merit to the defendant's claim that § 5845(b) was unconstitutionally vague. Citing the standard for determining vagueness, the Court concluded that there is "no such risk here" that ordinary people cannot understand what is prohibited or that this statute will result in arbitrary enforcement. *Id.* at 664.

## 2. THE AR-15 UPPER ASSEMBLY MAY LAWFULLY BE REGULATED AS A "RECEIVER" AS DEFINED BY THE IMPLEMENTING REGULATIONS BECAUSE THIS COMPORTS WITH STATUTORY LANGUAGE AND CONGRESSIONAL INTENT

The Gun Control Act of 1968 (GCA), 18 U.S.C. § 921 et seq., defines "firearm" to include not only "any weapon which will…expel a projectile by the action of an explosive," but also the "receiver" of such weapon. 18 U.S.C. § 921(a)(3). The term "receiver" is defined in the GCA implementing regulations, 27 C.F.R. § 478.11. The control of receivers as discrete "firearms" is a critical concept in federal firearms law.

Because the frame or receiver was to be the single regulated part of the firearm, Congress required that this part be serialized. 18 U.S.C. § 923(i). Serialization permits Federal Firearms Licensees (FFLs) to keep accurate records of the acquisition and disposition of firearms, and permits law enforcement to identify and track firearms used in crimes. 18 U.S.C. § 923(g); 27 C.F.R. § 478.121. Further, the regulation of receivers ensures that prohibited persons cannot obtain a firearm simply by obtaining the parts separately. By regulating the receiver, Congress ensured that aggregating the parts in a piecemeal way could not be used to skirt the law. However, Congress did not define the term "receiver" in the GCA, rather, the term "frame or receiver" is defined in the CFR.

Under the GCA-precursor, the Federal Firearms Act (FFA), all firearm parts were regulated by federal law. In the Omnibus Crime Control and Safe Streets Act of 1968, Congress repealed the FFA, passed the GCA, and amended the National Firearms Act (NFA). P.L. 90–351, 90th Cong., 2d Sess. (1968) 82 Stat. 197 (Title IV (§§ 901–907) of P.L. 90–351 repealed the Federal Firearms Act and enacted a new chapter 44 ("Firearms") of Title 18 (18 U.S.C. §§ 921–928)). During debate of the GCA and related bills introduced to address firearm trafficking, Congress recognized that the regulation of all firearm parts was impractical. *See* S.Rep. No. 90–1097 (1968) ("The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if

it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any

part or parts.'") Therefore, whereas the FFA had regulated all firearm parts, Congress in passing the

GCA eliminated federal controls over any and all parts. Congress determined, however, that it was

necessary to regulate one "part" of the firearm – the "receiver." *Id.*

The regulatory definition of receiver properly implements the statute by defining "firearm frame

or receiver" as a "part." Whereas the plural form "parts" is used throughout the regulations, the singular

form as used in defining "frames" and "receivers" was intentional. *See, e.g.*, 27 C.F.R. § 478.39; 27

C.F.R. § 478.92 (using the plural, "parts"). The singular form is necessary to give effect to the law. For

example, if a "receiver" was considered to be comprised of two "parts," as the defendant suggests,

manufacturers and importers would be able to avoid the serialization requirements and importation

restrictions, and prohibited persons would be able to obtain firearms without a background check or

other controls. *See, e.g.,* 18 U.S.C § 922(l). Specifically, the parts could be manufactured, imported or

sold separately so that they would remain individual, unregulated parts during any particular transaction.

For instance, under this analysis the serialization requirements under § 923(i) would exist only when a

manufacturer assembled the upper assembly and lower portion of the firearm. Manufacturing,

importing, or obtaining firearms in such a piecemeal fashion without a single regulated part would

effectively nullify the statute.

In addition, the regulatory definition of "firearm frame or receiver" was implemented after the

development of firearms with "upper" and "lower" assemblies or "receivers." The M-16/AR-15 design

predates both the GCA and the current definition of machinegun[2] in the NFA. *See* Curtis Decl., ¶ 5.

Therefore, the ATTD knew of the design of the M-16/AR-15 when it drafted the current definition of

"firearm frame or receiver." Further, ATTD made immediate notification to the public that the lower

portion of the M-16 was the receiver based upon the regulatory definition. For example, in 1971 the

---

[2] The NFA regulated machineguns starting in 1934 but did not include "receivers" until amended
in 1968.

Acting Director of the ATTD wrote that, regarding M-16 rifles, "we have determined that the lower receiver is in fact the receiver of a machine gun as that term is used" in the NFA. Letter to Assistant Regional Commissioner Re:M-16 Receivers Forged By Kaiser Aluminum and Chemical Company, Erie, Pa., and Subsequently Machined by Firearms Manufacturers such as Colt, H&R Arms Company, and General Motors Corporation (Feb. 23, 1971), attached at Government's Exhibit 4. Similarly, in replying to an inquiry in 1972, the Director informed an industry member that "this office has determined that for purposes of marking and control, the lower receiver is the receiver of the firearm." Letter to Mr. Michael D. Kokin of Sherwood Distributors Inc. (Jan. 19, 1972), attached at Government's Exhibit 4.

Since the passage of the GCA of 1968, federal law has regulated the lower portion of the AR-15/M-16 as the "receiver" of the firearm. Curtis Decl., ¶ 5. Well before the passage of the GCA, the lower receiver was the stated serialized and regulated portion of AR-15/M-16 weapons. In the 1950s, a company known as Armalite began designing the firearm that would become the AR-15 and the M-16. Both as prototypes and during mass production, the firearms were marked with serial numbers and identifying information on the part that is the current receiver. *See* Curtis Decl., ¶ 12. Therefore, by the time the GCA passed in October of 1968, Armalite and Colt had already produced, marked, and serialized thousands of these firearms. *Id.*



This is an early Armalite AR-type Rifle designed by Eugene Stoner in the 1950s.



Note the markings on the portion of the firearm
later classified as the "receiver" under the GCA

Similarly, the ATF and its predecessors have made such classifications with regard of other types of split-receiver firearms. For example, using the same reasoned approach, the ATF has similarly classified the receiver of the FN/FAL, another (different) type firearm referenced by the defense. Although their methodology for classification was consistent, the ATF designated the upper half of the receiver of the FN/FAL, rather than the lower half, as the "receiver." In 1977, ATF explained that the FN/FAL "has a split receiver namely an upper and lower half." It explained that the "Office of Technical and Scientific Services expresses the view that the upper half is the controlling portion because it more nearly meets the definition of receiver as that term is defined in the statute…." Letter CC-23932 from Assistant Chief Counsel (Litigation) to Acting Assistant Director (CE) Re: FN FAL Machinegun Receivers (Jan. 24, 1977), attached at Government's Exhibit 4. The receiver of the FN/FAL contains an opening that permits the auto sear to engage the bolt and thereby allow automatic fire. The semiautomatic version contains no such opening. Therefore there is a significant physical difference between the receivers of semiautomatic and automatic FN/FAL rifles. *See id.* And again, the Bureau has been clear and consistent with regard to which "part" is the "receiver" and so regulated and

prohibited by law. This is not inconsistent with the Bureau's treatment of AR-15/M-16 weapons, as the defense contends, but a consistent way of dealing with two physically different firearms.

The Supreme Court has held that "if Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 843-844 (1984). ATF regulations cannot therefore undermine the statute that Congress passed. As shown above, Congress clearly intended to regulate only a single part of each firearm. Congress was well aware of the M-16/AR-15 design when it passed the GCA and NFA in 1968, and clearly intended that the law regulate these firearms as well. Therefore, if ATF had determined that a combination of the lower and upper assemblies were necessary to constitute a "receiver," ATF's decision would have been considered "manifestly contrary to the statute."

It appears that the defense expert O'Kelly's declaration is submitted in an effort to clear this as-applied hurdle by creating confusion where none exists. It is significant to note that O'Kelly admits and agrees that the ATF has determined that the lower rather than the upper receiver of an AR-15 firearm is considered the receiver for purposes of this statutory scheme. O'Kelly Decl., ¶ 9; *see also* Curtis Decl., ¶ 9. This agreement and admission affirms the government's position, as discussed above. The fact that O'Kelly correctly notes that this determination does not perfectly fit the CFR section definition is a red herring as this definition has existed side by side with the ATF's (and FFL's) treatment of the lower receiver of AR-15s as firearm receivers. O'Kelly's juxtaposition of two technically correct statements is misleading and the defense argument that O'Kelly believes that a lower receiver of an AR-15/M-16 is not a receiver is belied by O'Kelly's participation as an instructor at a 2009 firearm training course during which it was taught, consistent with ATF enforcement, that the lower portion of the AR-15/M-16 was the "receiver." Curtis Decl., ¶ 11.

//

### 3. NO PROVISION OF THE NFA HAS BEEN FOUND UNCONSTITUTIONALLY VAGUE

While there have been various creative approaches to claims that portions of the NFA are unconstitutionally vague, none have succeeded. *See, e.g., United States v. Bradley*, 892 F.3d 634, 638 (7th Cir. 1990) (affirming conviction for transfer of machinegun when defendant made sequential but separate shipments of a number of components, Court found argument "clever but unconvincing" as the defendant's "deeds pose no such complexities").

Although no defendant has previously argued ambiguity in the receiver-of-a-machinegun provision – likely because there has been no confusion and no arbitrary prosecution, upholding the machinegun definition and "frame or receiver" of a firearm language under the NFA is consistent with the body of legal precedent interpreting the NFA. *See ,e.g., United States v. Whalen,* 337 F.Supp. 1012 (S.D.N.Y. 1972) (holding that the National Firearms Act is not unconstitutionally vague); *United States v. Drasen,* 845 F.2d 731, 737-38 (7th Cir. 1998) (rejecting a vagueness challenge to the phrase "readily restored" in § 5845(c) defining "rifle"); *United States v. Catanzaro,* 368 F. Supp. 450, 452-54 (D. Conn. 1973) (rejecting a vagueness challenge to the phrase "maybe readily restored to fire" in § 5845(d), defining "shotgun," and § 5845(e), defining "any other weapon"); *see also United States v. Kurt*, 988 F.2d 73 (9th Cir. 1993), and *Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996) (upholding the constitutionality of these laws generally).

Defendant cites no case where any Court has struck down any provision in 26 U.S.C. § 5845 as unconstitutionally vague. Consistent with the other provisions upheld and other rationale provided by the Courts for upholding these and other provisions, the language at issue here provides adequate notice to the defendant and other persons of ordinary intelligence that possession of the AR-15/M-16 style receiver milled out with a special hole to insert a part to make the firearm automatically fire is illegal under statutes including 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(d) as a machinegun.

//

### 4. DEFENDANT'S POSITION WOULD RENDER MORE PERNICIOUS FIREARMS LEGAL UNDER THE VARIOUS FIREARMS STATUTES

If the defendant's position were correct, then machinegun receivers would also not qualify as firearms under many important federal laws, including the law against possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).[3]  This is significant because the definition of a firearm for purposes of prosecution under § 922(g) similarly includes the "frame or receiver" of a firearm.  18 U.S.C. § 921(a)(3); *see also United States v. Hunter*, 843 F. Supp. 235, 256 (E.D. Mich. 1994)  (§ 921(a)(3) incorporates § 921(a)(23) which, in turn, incorporates § 5845(b), and  "reading the statutes together it is indisputable that conversion kits are machineguns under Title 18."  "The Court does not see how else one could read these provisions.")  Therefore, if the defendant's position was accepted, it would follow that AR-15/M-16 lower receivers would not only not be prosecutable as "machineguns" under Title 18, Section 922(o), or "firearms" under Title 26, but would also no longer be prosecutable as "firearms" at all under Title 18, Section 922(g).  As a result, felons, addicts, and other prohibited persons could not possess the frame or receiver of a .22 caliber handgun, but could possess with impunity under the federal statutory scheme the receiver of a semi-automatic or fully automatic AR-15/M-16, arguably in either form a more dangerous firearm than a .22 caliber handgun, but certainly more dangerous where the receiver has been milled for fully automatic use.  Such a result would defy not only the clear intent of Congress to more heavily regulate certain types of firearms viewed as more dangerous, but common sense as well.

## B. DEFENDANT'S CLAIM MUST FAIL BECAUSE THE STATUTE CLEARLY PROSCRIBES DEFENDANT'S CONDUCT

A defendant cannot claim a statute is unconstitutional in some of its reaches if the statute is constitutional as applied to him.  *Kurt*, 988 F.2d at 76 (though there was a possible exception that could have rendered defendant's conduct resulting in conviction of possessing an unregistered machinegun under §5861(d) lawful, no evidence existed that this exception applied to this defendant).  *See also*

---

[3] The government has not at this time sought to charge the defendant with violating § 922(g)(1) because although the defendant is a felon and did possess a firearm, the government is still investigating when and under what circumstances the firearm was shipped or transported in interstate commerce.

1   discussion *infra* Part IV.A.1 *citing Williams* and *Carter.*

2          Here, the facts demonstrate that defendant's conduct clearly falls within the statutory proscribed

3   conduct. The firearm part that the defendant possessed and intentionally purchased was a machinegun

4   receiver. The advertisement of the receiver at Exhibit 3 that the defendant responded to, the

5   defendant's nickname of the UC as "80%" in his phone, and his receipt of photos of the receiver, show

6   that the defendant had full knowledge of the essential characteristics of the item he was purchasing.

7   Moreover, the conversations via text message between the defendant and the UC, as well as the recorded

8   conversation between the defendant and UC further reflect the defendant's knowledge of the capabilities

9   of the receiver to fire automatically.

10         Finally, the receiver purchased by the defendant is an AR-15/M-16 style lower receiver that has

11  been classified for decades under the current statutory scheme as a receiver. *See* Curtis Decl., ¶ 5. This

12  is not one of the theoretical situations that the defendant argues might hypothetically cause confusion,

13  such as prosecution for possession of an upper assembly of an AR-15 style firearm, or lower assembly

14  of an FN/FAL firearm. And, in fact, the government is not aware of a single instance in which a person

15  has been prosecuted in federal court for unlawful possession of a firearm for possessing only the upper

16  assembly of an AR-15/M-16 firearm. *See* Curtis Decl., ¶ 6. To the contrary, the ATF National

17  Academy instructs that the lower receiver is the receiver for AR-15/M-16 firearms. Instructor and

18  Enforcement Officer Michael R. Curtis has testified twice in criminal cases that the lower receiver is the

19  receiver for AR-15/M-16s, and has never testified that the upper assembly of such a firearm is the

20  "receiver" under this statute. *Id.* Thus, defendant cannot successfully challenge the law based on a

21  hypothetical that does not exist in this case.

22         The remainder of O'Kelly's Declaration, and the corresponding defense brief, adds no facts or

23  arguments relevant to a constitutional challenge *as applied to AR-15/M-16 lower receivers.* O'Kelly

24  presents facts which attempt to refocus the Court on upper assemblies, combinations of firearm parts,

25  whether a hole drilled in a gun can be a firearm "component," and whether the law as applied to

26  FN/FAL firearms is vague. None of these characterizations are relevant to determine whether the statute

27  proscribing the AR-15/M-16 designed receiver is vague. The defense cites similarly inapposite case

28

law.  *United States v. 1,100 Machine Gun Receivers*, 73 F. Supp. 2d 1289 (D. Utah 1999), involves AKM-type Russian m military rifles, not AR-15/M-16 style firearms.

O'Kelly also attempts to reason that although the AR-15 receiver in this case has been milled to receiver an auto sear, without adding the auto sear, it could just as easily be used as a semi-automatic weapon.  This is yet another dead-end detour.  *See, e.g., United States v. One Harrington and Richardson Rifle, Model M-14, 7.62 Caliber, Serial Number 85279,* 378 F.3d 533, 534 (6th Cir. 2004) (Moreover, even if the rifle's capacity to fire in full-automatic mode was destroyed … that does not refute the ATF's finding that the rifle qualified as a machine gun because it retained features specific to the M–14 and could have been readily restored to fire automatically.)  In fact, the Courts have deferred to the ATF's "reasonable classification" of firearms as machineguns for M-14 style firearms.  While this is a different design of firearm, the fact that in these other cases the Court found that there was some area "within reason" for the ATF to make such determinations is again consistent with the ATF making a reasonable determination regarding the receivers of AR-15/M-16 style firearms, and making a public declaration of such determination.  *See id.* at 534; *York v. Secretary of Treasury,* 774 F.2d 417, 419-20 (10th Cir. 1985) (ATF classification of YAC STEN MK II weapon as a machinegun "requires deferential treatment by the court.").

It is an AR-15/M-16 style firearm at issue in this case, not an FN/FAL, so to the extent an individual of ordinary intelligence has been provided adequate notice by the statute regarding the portion of the FN/FAL style weapon which is proscribed under the law – or, frankly, whether any person may think that an upper receiver may be proscribed under the law – is not relevant to an as-applied challenge in this case.  Whether or not an individual might erroneously believe some other firearm part to be illegal under the statute is not an issue before the Court at this time.  The only issue before this Court is whether the statute gives adequate notice to a person of ordinary intelligence that the lower receiver purchased and possessed by the defendant in this case is illegal.

# V. CONCLUSION

The lower receiver of an AR-15/M-16 style firearm is the receiver for purposes of the statutory scheme. Law enforcement has consistently proclaimed and demonstrated as much. That individuals of ordinary intelligence would understand that the receiver at issue in this case is illegal to possess is reflected in the defendant's actual understanding of such demonstrated through his behavior, statements, and choices. The defendant knew the AR-15/M-16 receiver was a machinegun, and it was for this very reason that he wanted to purchase this weapon. Not because he believed what he was buying was legal, but because it had the capability when additional parts were added to fire automatically. The defendant eschewed buying the completed Glock firearm in favor of the AR-15/M-16 receiver. He understood the receiver could be made to fire automatically or, if the sear hold was plugged, to fire as a semiautomatic. He also understood that either way, the receiver he was buying for $450.00 cash in a shopping mall parking lot, was illegal.

Accordingly, for the foregoing reasons, the government asks that the Court deny Defendant's Motion to Dismiss Counts One and Two of the Indictment.

DATED: December 3, 2015                    Respectfully submitted,


                                           BRIAN J. STRETCH
                                           Acting United States Attorney


                                           /s/ Brigid S. Martin
                                           BRIGID S. MARTIN
                                           Assistant United States Attorney

EXHIBIT 4

CC:ATF-12,736
T:JRW



21208

*memorandum*

March 1, 1971

to: J. F. McCarren

from: J. R. Wachter

subject: M-16 Receivers

Apparently the M-16 receiver is fabricated in two parts, and the Enforcement Division has determined that the lower portion should be considered the receiver, and, thus, a machine gun under 26 U.S.C. 5845(b). This matter was discussed in a conference attended by Mr. Powell and myself with Messrs. Darr, Westenberger, Scroggie, and, I believe, Mr. Wolfe, which included an examination of the weapon.

We were assured at that time that the lower portion comes closest to meeting the definition of frame or receiver in 26 CFR 178.11 although both parts were necessary to function as a "frame or receiver" in a machine gun.

I can see some difficulty in trying to make cases against persons possessing only the lower part of a receiver, but insofar as the licensing, serial numbering, and special occupational tax requirements are concerned, I feel that this is the only practical solution.

I recommend your approval.

J. R. Wachter

I Concur: _W. T. Hare_          Date: _3/2/71_

Approved: _JFM_                 Date: _3/2/71_
    J. F. McCarren

Internal Revenue Service

12,736

1971

21208

Assistant Regional Commissioner (ATF)
Mid-Atlantic Region

Acting Director, Alcohol, Tobacco and Firearms Division
National Office                                    CP:ATsED:JEB

M-16 Receivers Forged by Kaiser Aluminum and Chemical Company, Erie,
Pa., and Subsequently Machined by Firearms Manufacturers Such as Colt,
H & R Arms Company and General Motors Corporation


     This is in response to a memorandum dated December 8, 1970, from
Stanley S. Sams, Area Supervisor, Pittsburgh ATF office, to Chief
Special Investigator, ATF Northern Section; reference:  51-PIL-71-30-
P-(T-II) Collateral.  The receivers and slides referred to in Mr. Sams'
memorandum have been received in this office.

     The aluminum castings produced by the Kaiser Aluminum Company
are not frames or receivers for firearms.  It is not necessary, there-
fore, that any action be taken in regard to these forged aluminum
blocks.

     Firearms manufacturers who subsequently machine these aluminum
blocks into upper and lower receivers for M-16 rifles, however, have
produced firearms receivers which are subject to the controls of the
National Firearms Act.  We have determined that the lower receiver
is in fact the receiver of a machine gun as that term is used in
Section 5845(b) of the National Firearms Act.  Therefore, it must
be identified by the name and address of the manufacturer and it
would also bear the serial number of the firearm.

     In regard to any of these M-16 bottom receivers which are
defective, it will be necessary for the manufacturers to destroy
them prior to their return to the Kaiser Aluminum and Chemical
Company.  Such returned receivers must be destroyed in a manner
which will insure that they are no longer machine gun receivers.

     If these receivers are not so removed from control under the
Act, all parties possessing them will have to be properly qualified
under Title I and Title II of the Gun Control Act of 1968.  We have
retained custody of the forged aluminum blocks and the machined
upper and lower receiver for reference purposes.

                                   Rex D. Davis

RECEIVED

FEB 23 1971

JAN 19 1972      CP:AT:EF:T:RJS

Mr. Michael D. Kokin
Sherwood Distributers, Inc.
7435 Greenbush Avenue
North Hollywood, California   91605

Dear Mr. Kokin:

This is in reply to your letter of January 11, 1972, in which
you asked whether the upper receiver or the lower receiver of the
Colt AR-15/M16 is considered to be the receiver for marking pur-
poses.

This office has determined that for the purposes of marking
and control, the lower receiver (item 42, figure 9-2) is the
receiver of the firearm.

Sincerely yours,

(signed) Rex D. Davis

Rex D. Davis, Director
Alcohol, Tobacco and Firearms Division

cc:  ARC:ATF
      Western Region
RJScroggie:glc
1-17-72



# THE DEPARTMENT OF THE TREASURY
### BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
### OFFICE OF CHIEF COUNSEL
### WASHINGTON, D.C. 20226

JAN 24 1977

REFER TO

CC-23,932 L:CRN

MEMORANDUM TO:  Acting Assistant Director (CE)

FROM:  Assistant Chief Counsel (Litigation)

SUBJECT:  FN FAL Machinegun Receivers (T-II)

This refers to your above-captioned memorandum which was received in this office on November 2, 1976. Attached to your memorandum was a memorandum, with attachments, from the Central Region pertaining to the same subject. The Central Region has raised a question concerning the FN FAL machinegun split receiver which you believe should be reconciled since their position with regard thereto appears to conflict with an opinion of the Office of Technical and Scientific Services.

The particular weapon in question has a split receiver namely an upper and lower half. The Central Region believes that the lower half is the controlling part and should thus be the portion which has the serial number impressed thereon. The Office of Technical and Scientific Services expresses the view that the upper half is the controlling portion because it more nearly meets the definition of "receiver" as that term is defined in the statute and thus the upper half should bear the serial number of the weapon. Our views with respect to this problem have been requested.

Apparently the Central Region's view is based, at least in part, upon two factors, which are:

> 1. In 1971 the M-16 rifle was examined by this Bureau and, since it also was a split receiver rifle the determination was made that the serial number should be imprinted upon the lower half. Even though the M-16 was the weapon under consideration, the

Acting Assistant Director (CE)

>memorandum reflecting the Bureau's finding
>stated: "We have determined that the lower
>receiver is in fact the receiver of a
>machinegun as that term is used in
>section 5845(b) of the National Firearms
>Act. Therefore, it must be identified
>by the name and address of the
>manufacturer and it would also bear
>the serial number of the firearm." This
>quotation was taken completely out of
>context by some of the readers of the
>memorandum and it was erroneously assumed
>that all split receivers were to be
>treated the same as the M-16. (Such an
>assumption is totally incorrect.)
>
>2. It was published in Bureau Publication
>603 and its successors under "questions
>and answers" that with regard to weapons
>having both an upper and lower receiver
>the serial number must be impressed into
>the lower receiver. This question and
>answer will no longer be published.

Basically, the FN FAL rifle was designed to fire
automatically and was the standard weapon of the NATO
ground forces. Several thousand of these weapons were
lawfully imported into the United States after a
slight modification had been made of the upper portion
of the receiver which would prevent automatic fire.
With regard to these weapons, the upper receiver which
had been designed for automatic fire had been modified.
It is a simple process to adapt these weapons so they
can fire automatically.

Many more FN FAL rifles have been imported which utilize
an upper receiver which was designed and manufactured
to fire semi-automatically. Such weapons are true
sporting rifles and were never manufactured from a
machinegun. The only difference between the rifles
referred to in this paragraph and those in the previous

Acting Assistant Director (CE)

paragraph is in design of the upper half of the
receiver. The upper half of the receiver of the
"sporting" rifle cannot be easily converted to fire
automatically.

Since the design of the upper half of the receiver
is the only distinguishing characteristic between
those semi-automatic FN FAL rifles made from a
machinegun and the true "sporting" version, it appears
to us that this is the portion of the receiver that
should bear the serial number.

It should be kept in mind that this memorandum is
addressed only to the FN FAL rifle and any other
split receiver weapon should be examined with a view
toward determining if the upper or lower half of the
receiver more nearly fits the legal definition of
"receiver."

We have examined the criminal case report forwarded to
this office with your memorandum in which at least
one of the defendants was convicted, upon his guilty
plea, of possessing a machinegun because he possessed
the lower portion of an FN FAL weapon which was
unserialized. Once a decision has been made as to
whether the upper or lower half of the FN FAL weapon
is the "receiver," we believe that the Department of
Justice should be advised with respect to this criminal
conviction so a decision can be made as to the proper
course of action to be pursued.

The case report forwarded by you is returned herewith.

James R. Wachter

Attachment